28728. ARKANSAS FUEL OIL CO. *v.* ANDREWS POINT CO.

DECIDED FEBRUARY 8, 1941. REHEARING DENIED MARCH 26, 1941.

*McElreath, Scott, Duckworth & Riley,* for plaintiff in error.

*George & John L. Westmoreland, Joselove & Berman,* contra.

SUTTON, J. The Andrews Point Company leased a vacant lot in the City of Atlanta to the Arkansas Fuel Oil Company, and the lessor agreed to build thereon a filling-station in compliance with plans and specifications furnished by the lessee. The lease provided, among other things, "to erect and complete such building and improvements with due diligence, provided, however, lessor shall not be obligated to expend for such purpose more than $5000, lessee to pay any excess of that amount required for completion." After the building was erected and the improvements were completed, the lessor brought this suit against the lessee, to recover the sum of $2482.46, which it contended it spent in excess of the $5000 in making said improvements. A copy of the lease contract and an itemized statement of the cost of the labor and material, totaling $7482.46, were attached to the petition. The defendant answered, denying that the plaintiff was entitled to recover. The jury returned a verdict in favor of the plaintiff for $2182.46 principal and $108 interest. The exception is to the overruling of the defendant's motion for new trial.

1. On the admission of the following testimony of Ben J. Massell, president of the Andrews Point Company: "As to what amount we paid out for the erection of this building in accordance with the plans and specifications, the building cost us in excess of $7400. I haven't got the exact figures before me; my book will show it. . . The Andrews Point Company paid for the construction of this filling-station, this building, the amounts set forth in this itemized statement as attached here and identified," error is assigned on the grounds (1) that it was a conclusion, and not the proper way to prove the cost of the construction of the building; (2) that it was based on the records of somebody else, and the checks would be the best evidence of what he paid out; (3) that the witness did not testify that he knew that the expenditures which he said he made on the building were for things that actually went into the erection of the building.

In addition to the testimony objected to as just stated, this witness testified, without objection, that while the filling-station was be-

ing erected he went by on an average of three times a day and inspected the building to see whether or not it was being properly constructed; that it was constructed in accordance with the lease contract and the plans and specifications for the building, and that it was completed, turned over to, and accepted by the Arkansas Fuel Oil Company. He identified the paper signed by that company, accepting the building after its completion. He testified, that that company had one of its officials on the premises looking after and inspecting the construction of the filling-station while it was being erected on the vacant lot; that that company had also a resident engineer on the job, looking after the work while the building was being erected; that the witness was president of the Andrews Point Company; that he had a bookkeeper, an architect, and a lady assistant who looked after the details of the work, but he passed on the questions of making contracts, purchases, and the actual expenditures; that when this question came up about this building, every single dollar of the expense that went into the building was brought to his attention; that the figures were his bookkeeper's, but he signed the checks that paid for every penny that went into the construction of the filling-station, and in addition to signing the checks he o. k.'d the contracts and pay-rolls, etc. As to his own knowledge of the correctness of the itemized statement of the cost of the construction of the filling-station, he testified that he went over those figures with his bookkeeper, and that he and the bookkeeper went over each item with representatives of the Arkansas Fuel Oil Company and checked and rechecked each item, and that the representatives of the defendant company made no objection to any of the items. He further testified that he knew of his own knowledge that the amounts set out in the itemized statement had been paid.

The court did not err in admitting the evidence objected to, as above specified. It is shown by the testimony of this witness, which was not objected to, that he was familiar with and had personal knowledge of all expenditures incurred in the construction of the filling-station. He had checked all the items of expense, and in fact had paid for all of the labor and material that went into the construction of the building and improvements, by signing checks therefor; and he was in a position to testify from his own knowledge what his company had spent in the erection of the filling-station.

R. F. Dalon, bookkeeper for Massell's company, testified, that he kept and supervised the keeping of the records of the labor and material used in the construction of the filling-station in question; that the itemized statement of the cost thereof, attached to the plaintiff's petition, was true and correct; that he was the purchasing agent for the Andrews Point Company; that he bought the material used in the construction of the filling-station, and that he bought at the best market price for the kind and quality of materials called for by the plans and specifications for this building. Dalon testified at length, and it appears from the record that he was entirely familiar with the books, records, and purchases made in connection with the construction of the filling-station in question, and that the itemized statement of the cost of same, attached to the petition, was true and correct.

R. L. Thedford testified, that he was the superintendent in charge of the construction of the filling-station; that it was built in accordance with the plans and specifications; that he signed all the dray tickets for the materials delivered on the job, and then checked these over in the office with Dalon, the bookkeeper, and also checked the invoices with him, and there was not anything in those invoices that he checked with Dalon, of materials and supplies delivered on the job, that was not used on that job; that the material for the erection of the filling-station was all used there—none of it was hauled away. He testified that the time-books and pay-rolls were kept accurately and turned over to Dalon, the bookkeeper, and that he checked these over with him.

2. It was not error to reject the testimony of a witness offered by the defendant, who, it is claimed, would have testified that in his opinion the reasonable cost for labor and materials in erecting the filling-station would not have exceeded $5500. The court properly ruled that the question of the cost of the filling-station was factual, not a matter of opinion.

3. Grounds 3 (complaining of the admission in evidence of a letter submitting a bid to do the wiring for the filling-station), 4 (complaining of the statement in the testimony of the electrician who did the wiring, that Mr. Massell could not buy the material at the cost he could), and 5 (complaining of a remark in the testimony of Dalon, that the sewer was bought for the filling-station and not for a flower shop), show no prejudicial error against the

plaintiff in error, and are without merit. This same ruling applies to another ground where the defendant complains that the court allowed the plaintiff to tender in evidence the bills and invoices of all the materials and supplies, held in one pack with rubber bands, over the objection that they were not properly identified. The bookkeeper, who was entirely familiar with all of the records and invoices, testified that he made the purchases of the materials and supplies that went into the construction of the filling-station, and had checked all of the bills and invoices; and he testified as to the correctness of his records and the itemized account made up from said invoices. In these circumstances no error is shown in admitting the invoices in evidence as they were tendered.

4. After the jury had retired to consider its verdict, "counsel and the court agreed upon an open verdict," and counsel for both parties left the court. Some time thereafter the court sent a bailiff for the jury, and when the jury returned to the court-room the following transpired: The court: "Now, Mr. Foreman, I want to make my question to you perfectly clear. I do not want to know anything about how you all stand in the case or any of the details of your deliberations, but I want you to tell me in your judgment what the probabilities are of the jury agreeing on a verdict in this case. Who is the foreman?" The foreman: "I am, your honor. That is a little doubtful. I mean I can't say definitely whether there is or not. I don't know whether it is even legitimate for me to make this statement, but there is four of us absolutely in accord, and we have one—" The court: "I say I don't want to hear the details." The foreman: "It may come around, your honor. I would at least say before we declare a mistrial I would rather see if it could not be brought around." The court: "I will give the matter direction. Have a seat, please, sir. Now, I want to make this statement, gentlemen, the law authorizes it, and tell you that no juror ought to violate his conscience. Nevertheless it is the duty of jurors, when they can, to agree in a case, and not to disagree. Court trials are expensive; and I say this again, without reservation, that a man should not violate his conscience, but if he can reconcile his conscience to a verdict it is the duty of jurors as a whole and individual jurors to agree in a case, and not to disagree. Retire to your room." The judge by these instructions did not unduly press or coerce the jury into reach-

ing a verdict, as contended in ground 6. His statement was fair, and, in the circumstances as there presented, can not be held as prejudicial to the plaintiff in error. "The trial judge is vested with large discretion in the conduct of judicial proceedings, and he may properly admonish the jury as to the desirability and importance of agreeing on a verdict, and may urge them to make every effort to do so consistent with their consciences." *Brown* v. *State,* 36 *Ga. App.* 83 (2) (135 S. E. 513). "A trial judge may properly call the attention of the jury to the importance of the case, the trouble and expense it has given, and suggest the desirability of disposing of it by a final verdict, urging them to make an honest effort to agree and to listen to the counsel of their fellow jurors and discuss the differences of opinion as to the proper verdict with them. *Golatt* v. *State,* 130 *Ga.* 18 (60 S. E. 107); *Chandler* v. *State,* 124 *Ga.* 821 (53 S. E. 91); *Parker* v. *Georgia Pacific Ry. Co.,* 83 *Ga.* 539 (10 S. E. 233); *Allen* v. *Woodson,* 50 *Ga.* 53 (2); *Varnum* v. *State,* 25 *Ga. App.* 560 (103 S. E. 742); *Brown* v. *State,* supra [36 *Ga. App.* 83 (2) (135 S. E. 513)]." *Baker* v. *Augusta Veneer Co.,* 46 *Ga. App.* 768, 769 (169 S. E. 254). See also *Gibson* v. *Gibson,* 54 *Ga. App.* 187 (5) (187 S. E. 155).

5. The verdict was authorized by the evidence, and the court did not err in overruling the motion for new trial.

*Judgment affirmed. Stephens, P. J., and Felton, J., concur.*